UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

PATRICIA ELNORA STOWELL,

          Plaintiff,

    v.

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

          Defendant.

Case No. 6:11-cv-06262 -ST

OPINION AND ORDER

STEWART, Magistrate Judge:

## INTRODUCTION

Plaintiff, Patricia Elnora Stowell ("Stowell"), seeks judicial review of the final decision by the Social Security Commissioner ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("SSA"), 42 USC §§ 401-33.  This court has jurisdiction to review the Commissioner's decision pursuant to 42 USC § 405(g).  For the reasons set forth below, that decision is REVERSED and REMANDED for an award of benefits.

## ADMINISTRATIVE HISTORY

Stowell protectively filed for DIB on October 10, 2007, alleging a disability onset date of May 31, 2007.  Tr. 107-09.[1]  Her application was denied initially and on reconsideration.  Tr. 53-57, 60-62.  On September 17, 2009, a hearing was held before Administrative Law Judge ("ALJ") Wade Morrison.  Tr. 24-50.  The ALJ issued a partially favorable decision on March 26, 2010, finding Stowell disabled since July 1, 2009, but not prior thereto.  Tr. 19.  Stowell requested a review of that decision on May 26, 2010, and submitted additional medical records, including a psychological evaluation completed by Judith Eckstein, Ph.D., on May 12, 2010.  Tr. 222-23.  The Appeals Council denied the request for review on June 23, 2011.  Tr. 1-3.  Therefore, the ALJ's decision is the Commissioner's final decision subject to review by this court.  20 CFR § 404.981.

## BACKGROUND

Born in March of 1952, Stowell was age 57 at the time of the hearing before the ALJ. Tr. 11, 107.  She completed high school and obtained a Certified Nursing Assistant ("CNA") certification.  Tr. 29-30.  She has past relevant work experience as a CNA or home health care provider and telemarketer.  Tr. 30.   Stowell alleges that she is unable to work due to the combined unspecified impairments affecting her heart and back, as well as obesity, low oxygen level and cataracts.  Tr. 138.  On appeal from the initial denial, she also alleged "delayed brain functioning."  Tr. 192.

## I.    Medical Records

In November 2006, Stowell reported back pain that was worse with sitting and better with standing and an inability to stand for long because of her weight.  Tr. 248.  She was

---

[1]  Citations are to the page(s) indicated in the official transcript of the record filed on January 27, 2012 (docket # 12).

diagnosed with hypertension and sciatica due to obesity and was told to increase her exercise and diet. *Id.* A lumbar spine x-ray revealed mild degenerative disc disease "from L1 to L5 with more prominent degenerative disc narrowing at the L5-S1 level where vacuum disc phenomena was present." Tr. 258.

On March 16, 2007, Stowell reported that Tramadol decreased the sciatica pain, but that her pain was increased in the nodule. Tr. 246. In August 2007, she reported an irregular heartbeat and awakening with shortness of breath two or three times a night. Tr. 244. Her doctor noted that she had an abnormal EKG and recommended using a Holter (a heart monitor) to determine her condition. *Id.*

In September 2007, Stowell reported no further episodes of irregular heartbeat. Tr. 243. A nurse practitioner advised her to decrease her food intake and increase her exercise. *Id.* The following month, Stowell reported diplopia (double vision), difficulty reading road signs and the computer screen, and problems with bright lights. Tr. 235. Cataracts were suspected. *Id.*

Also in September 2007, Stowell saw Cynthia Kremser, M.D., reporting several hours of an irregular heartbeat during which she felt tired, but not light headed, and no more short of breath than usual. Tr. 239-40. Dr. Kremser noted a "lateral T-wave abnormality," but no atrial fibrillation. *Id.* A sleep oximetry showed a prolonged period of severe desaturation. *Id.* Stowell also reported that she was always short of breath, felt "smothered" if she lies supine, and developed leg numbness after walking for more than five minutes. *Id.* Dr. Kremser concluded that Stowell's symptoms were consistent with paroxysmal atrial fibrillation (irregular heartbeat that occurs only occasionally). *Id.* Dr. Kremser wrote that Stowell's dysrhythmia, exertional and positional dyspnea, and right-

sided heart failure were all probably rooted in obesity/hypoventilation syndrome and obstructive sleep apnea.  Tr. 240.

Stowell underwent successful cataract surgery on May 17, 2008.  Tr. 201.

In June 2008, a nurse practitioner again advised her to lose weight, and diagnosed diabetes.  Tr. 296.

In July 2009, Stowell reported two weeks of chest heaviness, dizziness, shortness of breath, a cough and anxiety.  Tr. 313-14.  The nurse practitioner, Michelle Jones ("Jones"), noted that Stowell was obese and poorly groomed and diagnosed congestive heart failure.  Tr. 312, 314.  A chest x-ray revealed cardiomegaly (enlarged heart).  Tr. 311.

On August 27, 2009, based on her one examination, Jones completed a medical evaluation stating that Stowell suffered from chest pain, morbid obesity, hypertension, congestive heart failure, and diabetes mellitus II.  Tr. 320.  Other than the chest pain, the conditions were expected to last for at least 12 months.  *Id.*  Stowell's symptoms were recurrent chest pain with dizziness, shortness of breath and cough.  Tr. 321.  Her signs were morbid obesity, cardiomegaly, uncontrolled blood sugars, cardiac murmur, and edema in the legs.  *Id.*  She noted that Stowell needed to elevate her feet in a reclined position during the day.  *Id.*  She also wrote that Stowell was taking Aldactone (potassium-sparing diuretic) that may cause frequent urination.  Tr. 322.  Her conditions would be sufficiently severe that she would be unable to maintain a regular work schedule more than two days per month.  *Id.*

At her next visit with Jones in October 2009, Stowell again complained of chest pain and shortness of breath.  Tr. 332.  Jones noted that psychologically Stowell was "flat." *Id.*

In November 2009, Dr. Kremser saw Stowell for chest discomfort.  Tr. 329.  He noted that she had very severe sleep apnea and was intolerant of the CPAP (continuous

positive airway pressure) therapy.  *Id.*  She was unable to stand, had some leg swelling, and was very tachypneic (rapid breathing) and coughing after a few seconds of being semi recumbent.  *Id.*  He concluded that the chest heaviness could include myocardial ischemia and pulmonary hypertension and that her orthopnea (shortness of breath) may be due to airway obstruction or left heart failure. *Id.*

## II.    Post-Hearing Medical Records

Two months after the ALJ's March 26, 2010 decision, Stowell was examined by Judith Eckstein, Ph.D.  Tr. 342-57.  Her only previous psychological treatment had been some counseling for her weight through her church and twice 15-20 years ago for some of her childhood issues.  Tr. 347.  She had never been psychiatrically hospitalized or taken psychotropic medications.  *Id.*  Dr. Eckstein noted that Stowell had difficulty breathing, was unable to climb stairs, made appropriate eye contact and demonstrated no overt signs of distress.  *Id.*

Stowell reported that she tried to stay positive, but found it difficult when she could not do things.  *Id.*  She blamed herself for her weight, stating: "I got myself in this predicament; only I can get myself out."  *Id.*  She had suffered from obesity since the eighth grade and once lost 75 pounds on NutriSystem, but had not maintained this weight loss.  *Id.*  Because of knee problems she could no longer exercise. *Id.*  She reported sleeping one to two hours at a time and waking throughout the night.  Tr. 347-48.  She had panic attacks about two or three times a week in which she felt that she could not breathe, her heart fluttered, and she felt cold and clammy.  Tr. 348.  She also reported symptoms of claustrophobia, saying that she could not even be in the bathroom with the door closed.  *Id.*  She had some difficulty leaving her home because she was concerned that her obesity

5 – OPINION AND ORDER

embarrassed her children. *Id.* She tended to obsess about certain thoughts and was preoccupied with financial issues. *Id.* She had difficulty with concentration, stating that she would lose track of time. *Id.* She would leave out ingredients when cooking or misplace things and had difficulty remembering day to day items. *Id.* She wondered if sleep apnea played a role in her forgetfulness. *Id.*

Testing revealed that Stowell was in the lower end of the average IQ range. Tr. 349. However, her processing speed was in the 5th percentile and represented "a degree of slowness that would preclude her from sustaining competitive employment." *Id.* Otherwise, she was generally functioning adequately. *Id.* Dr. Eckstein added:

> However, it is presumed that her slower speed would have been in evidence from 2007 to the present as there have been no recent changes in her status that would account for a drop in these scores. Certainly, her lack of timeliness would likely have been a strong factor in her inability to continue her job functions at the time she was let go from her position.

*Id.*

The Personality Assessment Inventory ("PAI") showed that Stowell "responded appropriately and consistently" and saw "her life as severely disrupted by physical problems, some of which may be stress-related." *Id.* These problems had "left her tense, unhappy and have probably impaired her ability to concentrate on important life tasks" and "may have caused friction in close relationships." *Id.* Dr. Eckstein observed that Stowell appeared to be "experiencing a high level of anxiety and tension with difficulty relaxing, as well as physical signs of tension such as sweaty palms and trembling hands, etc." *Id.* She also appeared to have significant depressive symptomatology and "difficulty with her thought processes, finding them marked by confusion, distractibility and difficulty concentrating." Tr. 350. Dr. Eckstein found Stowell motivated for psychological treatment,

6 – OPINION AND ORDER

but that she "may feel too disorganized or overwhelmed to participate meaningfully" and "may also be reluctant to consider the possibility that her physical problems had a psychological component." *Id.*

Dr. Eckstein concluded that Stowell's "mood issues and slower working speed were likely to have been in effect since 2007, punctuated by her dismissal from her position of eleven years." *Id.* She did not appear to have severe mental health impairments, but "in conjunction with her medical problems, appear to be at a moderate level and would interfere with her ability to perform basic work activities at a normal rate." Tr. 350-51. Dr. Eckstein diagnosed Stowell with Panic Disorder without agoraphobia and Dysthymia with a GAF (global assessment of functioning) of 55 (Tr. 351), which denotes moderate symptoms or moderate difficulty in social, occupational, or school functioning. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (2000), p. 44.

Dr. Eckstein also completed a questionnaire concerning her mental residual functional capacity and found that Stowell was "markedly" limited in her ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. Tr. 354. She also identified numerous "moderate" limitations, including the ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Tr. 353-54. Stowell also had "moderate" limitations in her ability to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors. Tr. 354. She stated

that the onset of the limitations was December 18, 2007, the date that Stowell last worked. Tr. 355.

**III**.    <u>**Hearing**</u>

At the start of the hearing, Stowell's counsel explained that she had concentration deficits and other mental impairments that had not been assessed by the agency and requested a psychological evaluation because she was not in a position to have one done at her own expense. Tr. 28.

    **A.**    <u>**Stowell's Testimony**</u>

Stowell testified that she weighed 400 pounds. Tr. 31. She has swelling in her legs that can be relieved by putting her feet up. Tr. 36. She stated that her "brain is just not functioning right at times," though no doctor had told her to see a psychologist or psychiatrist. Tr. 33.

Stowell's last work as a telemarketer ended on December 18, 2007, after 11 years. Tr. 30. She would sometimes forget where she was in the order, even though she had a script accessible, and was then required to return to the beginning and start over. *Id.* When her employer started recording phone calls, she also had problems remembering where she was. Tr. 35. She was taking too long per call, two to three minutes instead of one to two minutes. *Id.* In early 2007, she was put on probation by her employer for this reason. Tr. 38. Customers would become agitated when she was not taking their order fast enough. *Id.* She thought she had problems with the numbers because of her eye issue. Tr. 39. In 2007, she worked full time during the "busy" season, but her employer told her that she had "too much dead air" in her calls. Tr. 39, 128. When the employer let her seasonal workers go, she also laid Stowell off. *Id.* She could not return to the telemarketer job because the

employer had implemented new rules requiring both feet to be on the floor and not allowing the employees to stand up.  Tr. 32.

At home, Stowell can sit in a chair and wash dishes, but could not stand on her feet because of the swelling. Tr. 36-37.  Her daughter cooks their meals and does most of the household chores.  Tr. 36.

Stowell has difficulty obtaining medical treatment due to financial issues.  Tr. 37.  She used a cane but it was not prescribed.  *Id.*  Cataract surgery in May 2008 corrected the problems with her eyesight. Tr. 37-38, 201.  She has to go to the bathroom quite frequently, probably every hour and a half to two hours. Tr. 39-40.  She is short of breath any time she walks or moves. Tr. 40.  She catnaps three or four times a day for about 10-15 minutes.  Tr. 41.  She and her husband fight because she does not remember things he thinks she should.  Tr. 35.  When cooking she has a hard time remembering ingredients or how to put the dish together.  Tr. 42.  She does not go shopping.  Tr. 43.  When employed, she would arrive so tired that she did not have the energy to take a call.  Tr. 43.

### B.    Vocational Expert's Testimony

The ALJ asked the Vocational Expert ("VE") to consider a person who was limited to sedentary work, who could lift and carry 10 pounds, stand and walk two hours and sit for six hours of an eight-hour work day.  Tr. 45.  The person could not climb ladders, ropes or scaffolds and only occasionally climb ramps and stairs, stoop, climb, balance, kneel, crouch or crawl. Tr. 45-46.

The VE testified that such a person would be able to perform Stowell's past work as a telemarketer.  Tr. 46.  However, if she were limited to simple, repetitive tasks she would not be able to perform that job.  *Id.*  If the person missed work more than two days a month,

or had problems responding to customers promptly or quickly, she could not maintain that employment. Tr. 47. A telemarketer handles calls that come in one "right after the other." Tr. 48. A person cannot elevate her legs more than about a foot during the day in this type of job or lie down at will. Tr. 48-49.

## DISABILITY ANALYSIS

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 USC § 423(d)(1)(A). The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 CFR § 404.1520; *Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir 1999).

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If so, the claimant is not disabled. 20 CFR § 404.1520(a)(4)(i) & (b).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement. 20 CFR § 404.1520(a)(4)(ii) & (c). Absent a severe impairment, the claimant is not disabled. *Id*.

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations. 20 CFR § 404.1520(a)(4)(iii) & (d); 20 CFR Pt. 404, Subpt. P, App. 1 (Listing of Impairments). If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC"). The claimant's RFC is an assessment of work-related activities the claimant may still

perform on a regular and continuing basis, despite the limitations imposed by his or her impairments. 20 CFR § 404.1520(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work. 20 CFR § 404.1520(a)(4)(iv) & (e). If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy. *Bowen v. Yuckert*, 482 US 137, 142 (1987); *Tackett*, 180 F3d at 1099; 20 CFR § 404.1520(a)(4)(v) & (g).

The initial burden of establishing disability rests upon the claimant. *Tackett*, 180 F3d at 1098. If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC. *Id*. If the Commissioner meets this burden, then the claimant is not disabled. 20 CFR § 404.1520(a)(4)(v) & (g).

## ALJ'S FINDINGS

At step one, the ALJ concluded that Stowell has not engaged in substantial gainful activity since May 31, 2007, the date that the application was protectively filed. Tr. 13.

At step two, the ALJ determined that Stowell has the severe impairments of obesity, diabetes mellitus, hypertension, and obstructive sleep apnea. *Id.*

At step three, the ALJ concluded that Stowell does not have an impairment or combination of impairments that meets or equals any of the listed impairments. Tr. 14. The ALJ found that prior to July 1, 2009, Stowell had the RFC to perform sedentary work, with limitations to lift no more than 10 pounds; stand or walk for two hours and sit for six hours out of an eight hour work day with normal breaks; could not climb ladders, ropes, or

scaffolds; and could only occasionally climb ramps and stairs, stoop, kneel, crouch, or crawl. *Id.*

Based upon the testimony of a VE, the ALJ determined at step four that Stowell's RFC prior to July 1, 2009, did not preclude her from returning to her past relevant work as telemarketer. Tr. 17.

Since July 1, 2009, however, the ALJ determined Stowell did not have the RFC to sustain even sedentary work activity on a regular and continuing basis and thus was unable to perform past relevant work. *Id.*

At step five, the ALJ considered Stowell's age, education, and RFC, both before and after July 1, 2009. Tr. 18. He found Stowell was not disabled prior to July 1, 2009, but has been disabled since that date and has continued to be disabled through the date of the decision, with the disability expected to last 12 months or more. Tr. 18-19.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. 42 USC § 405(g); *Lewis v. Astrue*, 498 F3d 909, 911 (9th Cir 2007). This court must weigh the evidence that supports and detracts from the ALJ's conclusion. *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998). The reviewing court may not substitute its judgment for that of the Commissioner. *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F3d 1194, 1205 (9th Cir 2008), citing *Parra v. Astrue*, 481 F3d 742, 746 (9th Cir 2007). Where the evidence is susceptible to more than one rational interpretation, the Commissioner's decision must be upheld if it is "'supported by inferences reasonably drawn from the record.'" *Tommasetti v. Astrue*, 533 F3d 1035, 1038 (9th Cir

2008), *quoting Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004);
*see also Lingenfelter*, 504 F3d at 1035.

## DISCUSSION

Stowell argues that the Commissioner's decision is wrong because: (1) the ALJ
failed to obtain a psychological evaluation; (2) Dr. Eckstein's post-hearing opinion compels
a finding that Stowell suffers from mental impairments that would preclude her from work
as a telemarketer; (3) the ALJ failed to give clear and convincing reasons for rejecting
Stowell's testimony; and (4) the ALJ erred in finding that Stowell retains the ability to
perform her past work as a telemarketer, from October 17, 2007, to July 1, 2009.

## I.      Consultative Examination and Duty to Develop the Record

A claimant does not have "an affirmative right to have a consultative examination
performed by a chosen specialist." *Reed v. Massanari*, 270 F.3d 838, 842 (9th Cir 2001).
The Commissioner may, however, order an examination "to try to resolve an inconsistency
in the evidence, or when the evidence as a whole is insufficient to allow us to make a
determination or decision on [the] claim." 20 CFR § 404.1519a(b); *see also* §§ 404.1517,
404.1527(c)(3). "Ambiguous evidence, or the ALJ's own finding that the record is
inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to
conduct an appropriate inquiry." *Tonapetyan v. Halter*, 242 F3d 1144, 1150 (9th Cir 2001)
(internal quotation marks and citation omitted). This duty may require the ALJ to obtain
additional information, for example, by contacting treating physicians, scheduling
consultative examinations, or calling a medical expert. 20 CFR §§ 404.1512(e)-(f),
404.1519a. The court may reverse and remand the Commissioner's final decision where the
court concludes that the ALJ should have ordered a consultative examination. *See Reed*, 270

F3d at 843-45 (reversing and remanding based in part on ALJ's failure to order consultative examination).

The ALJ denied the request for a consultative examination, explaining:

> The claimant did not allege a mental impairment in her initial application and there is no diagnosis of a mental impairment in the claimant's medical records. Even if there was a basis to diagnose the claimant with anxiety or depression, the claimant's anxiety or depression was not a significant factor prior to July 1, 2009. Moreover a consultative examination would not assist in assessing the claimant's depression or anxiety prior to July 1, 2009.

Tr. 11 (citation omitted).

Although she did not initially allege a mental impairment, Stowell argues that she did list symptoms indicating her mental deficits in her October 17, 2007 function report. In that report, she stated that she sometimes forgets spoken instructions and has "panic attacks when unable to breathe or see things." Tr. 159-60. However, that report clearly blames her poor eyesight for her inability to drive, crochet, go out unaccompanied, and follow written instructions. Tr. 157-59, 161. This is fully consistent with her report in October 2007 to Dr. Kremser that she was suffering stress and had "[r]ecently lost her job as a telemarketer because she could not see." Tr. 239.[2] Moreover, Stowell stated in that report that she did not need reminders to go places, take her medication, or care for her personal needs, indicating no difficulties in those areas. Tr. 156, 158. And when asked to explain the reason for her problems, she described only physical impairments, as opposed to any mental impairment. Tr. 159.

---

[2] According to her Work Activity Report, she was put on probation in January 2007, was removed from the regular work schedule and placed on call at the end of April 2007, worked 12 days in May 2007, and was permanently laid off on May 31, 2007. Tr. 123. However, she was apparently called back to work at the end of 2007 during the busy season and last worked on December 18, 2007.

14 – OPINION AND ORDER

In her February 2008 update, she explained that her illness had changed: "I thought it was my sight but I know that it is my brain function.  Can't remember things sometimes. . . . It's like I have delayed brain functions.  I forgot what I'm [doing] frequently. . . . I think my delayed brain function has been a lot of my problems."  Tr. 192.  Despite this perceived change, she never reported any delayed brain function to any medical professional.  Before her cataract surgery in May 2008, she consistently blamed her difficulties on her vision.  Why she concluded that she also suffered from a delayed brain function in February 2008 is not explained.  Her vision improved after her cataract surgery in May 2008, but she still did not complain of any cognitive problems to any medical provider after that time.  In June 2008, a medical provider noted that her "Neuro" and "Psycho" were within normal limits. Tr. 296.

As the ALJ correctly noted, the record contains no objective medical evidence of any allegation or diagnosis of a mental impairment prior to July 1, 2009.  Stowell did find it hard to visit the doctor because of the expense.  Tr. 37.   However, none of the records of her visits to medical providers in 2008 or 2009 note any complaint of any mental impairment.  Because the evidence before the ALJ did not show any signs or symptoms of delayed brain function, the ALJ had no duty to order a psychological consultative examination.

## II.    Dr. Eckstein's Post-Hearing Evidence

With her request for review to the Appeals Council, Stowell submitted Dr. Eckstein's post-hearing comprehensive psychological evaluation.  Tr. 4, 345-57.  The Appeals Council received and reviewed this evidence but determined that it did not provide a basis for changing the ALJ's decision."  Tr. 2-3.

**A.**     <u>New and Material Evidence</u>

A claimant may submit new and material evidence to the Appeals Council when requesting review of an ALJ's decision, provided that the evidence relates to the period on or before the ALJ's decision.  20 CFR § 404.970(b); *Perez v. Chater*, 77 F3d 41, 45 (2nd Cir 1996).  Assessments completed retrospectively are probative evidence that should be considered.  *Smith v. Bowen,* 849 F2d 1222, 1225-26 (9th Cir 1988).  Here, Dr. Eckstein specifically addressed whether Stowell "has a severe mental impairment currently and if it was likely that she has had a severe mental impairment since May 31, 2007."  Tr. 345.

**B.**     <u>Substantial Evidence</u>

When rejecting post-hearing evidence, "the Appeals Council is not required to make any particular evidentiary finding." *Gomez v. Chater*, 74 F3d 967, 972 (9th Cir 1996).  If the Appeals Council examines the entire record and concludes that the new evidence did not "provide a basis for changing the hearing decision," courts may consider the new evidence and determine whether substantial evidence supports the ALJ's decision.  *Ramirez v. Shalala*, 8 F3d 1449, 1452 (9th Cir 1993).

The Commissioner argues that substantial evidence supports the Appeals Council decision, but even if not, the error is harmless because the new information does not alter, or would be inconsequential to, the decision that she was not disabled prior to July 1, 2009. *See Molina v. Astrue*, 674 F3d 1104, 1115 (9th Cir 2012) (finding legal errors harmless "where it was clear they did not alter the ALJ's decision.")

The Commissioner notes two problems with Dr. Eckstein's opinion.  First, Dr. Eckstein opined that Stowell's slow processing speed would preclude her from competitive employment.  A medical source opinion that a claimant is "disabled" or "unable

to work" is reserved for the Commissioner.  20 CFR § 404.1527(d)(1).  Nonetheless, the Commissioner cannot ignore that testing showed Stowell's processing speed to be at the low 5th percentile.  This is important objective medical evidence that was not addressed by the Appeals Council.

Second, Dr. Eckstein opined that Stowell's mood issues and slow processing have existed since 2007.  Tr. 349.  To support this opinion, Dr. Eckstein cited the lack of recent changes in Stowell's status to account for a drop in the scores.  Tr. 349.  As the Commissioner correctly notes, Dr. Eckstein did not state what records, if any, she reviewed in reaching this conclusion.  However, the letter to her from Stowell's attorney enclosed all of the medical records available to the Commissioner, as well as other documents.  Tr. 361-62.  Therefore, it is reasonable to assume that Dr. Eckstein reviewed those records.

The Commissioner also argues Dr. Eckstein failed to provide competent evidence in support of her opinion.  However, Dr. Eckstein performed standard testing which showed that Stowell had a slow processing speed and personality testing which showed depressive symptomology potentially impacting her ability to concentrate.  Tr. 349-50.  Dr. Eckstein concluded that her impairments were in place since 2007 when she lost her telemarketing job because at that time, Stowell was having trouble doing tasks she had routinely performed for the past 11 years.  Tr. 345.  She had difficulty with concentration, would lose track of time, and had trouble remembering how to do things she had done for years. Tr. 348.  "Her lack of timeliness would likely have been a strong factor in her inability to continue her job functions at the time she was let go of her position."  Tr. 349.  "Her mental impairments, in conjunction with her medical problems, appear to be at a moderate level and would interfere with her ability to perform basic work activities at a normal rate."  Tr. 351.

Thus, based on the new evidence of Dr. Eckstein's opinion, the Appeals Council erred by finding that substantial evidence supported the ALJ's decision.

## III.    Credibility Findings

The ALJ found Stowell "not credible" because:  (1) she told Dr. Kremser on October 8, 2007, "that she had recently lost her job as a telemarketer because she could not see, but she also testified that this problem was fixed with cataract surgery;" and (2) her 2007 fourth quarter earnings were during the employer's busy season, "suggesting that [she] was trying to be employed with this job for longer than the period noted in the record." Tr. 16.

### A.  Legal Standards

The ALJ must consider all symptoms and pain which can "reasonably be accepted as consistent with the objective medical evidence and other evidence."  20 CFR § 404.1529(a). Once a claimant shows an underlying impairment which may "reasonably be expected to produce pain or other symptoms alleged," absent a finding of malingering, the ALJ must provide "clear and convincing" reasons for finding a claimant not credible. *Lingenfelter,* 504 F3d at 1036, citing *Smolen v. Chater*, 80 F3d 1273, 1281 (9th Cir 1996).  The ALJ's credibility findings must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony."  *Orteza v. Shalala*, 50 F3d 748, 750 (9th Cir 1995), citing *Bunnell v. Sullivan*, 947 F2d 341, 345-46 (9th Cir 1991) (*en banc*).  The ALJ may consider objective medical evidence and the claimant's treatment history, as well as the claimant's daily activities, work record, and observations of physicians and third parties with personal knowledge of the claimant's functional limitations.  *Smolen*, 80 F3d at 1284.  The ALJ may additionally employ ordinary techniques of credibility evaluation, such as weighing inconsistent statements

regarding symptoms by the claimant. *Id.* The ALJ may not, however, make a negative credibility finding "solely because" the claimant's symptom testimony "is not substantiated affirmatively by objective medical evidence." *Robbins v. Soc. Sec. Admin.*, 466 F3d 880, 883 (9th Cir 2006).

**B.    Analysis**

**1.    Corrected Vision**

Dr. Kremser noted on October 8, 2007, that Stowell was under "[m]uch stress" because she had "[r]ecently lost her job as a telemarketer because she could not see." Tr. 239. She also claimed cataracts as one of her physical impairments on her disability application in October 2007. Tr. 137. However, as she testified at the hearing, her cataract surgery in May 2008 resolved this problem. Tr. 38. Thus, the ALJ concluded that Stowell was not entirely credible on the assumption that she claimed disability based on cataracts which had been removed. Tr. 16.

However, as discussed above, Stowell suspected by February 2008 that she not only had cataract-related vision problems, but also delayed brain functioning. Tr. 192. That suspicion has now been confirmed by Dr. Eckstein who opines that Stowell's slow processing speed contributed to problems taking orders, as well as problems with memory and concentration. Tr. 349. Based on the current record, Stowell's statement to Dr. Kremser is not inconsistent with her hearing testimony and is not a clear and convincing reason to cast doubt on her credibility.

///

///

///

## 2.    **Work History**

Stowell also reported that she could not work due to her impairments, and yet also earned $1,710.00 in the fourth quarter of 2007.   As a result, the ALJ concluded that Stowell "was trying to be employed with this job for longer than the period noted in the record." Tr. 16.

Stowell was attempting to continue full-time work, as in the past 11 years, but was let go because she was not performing.  She had "too much dead air" and forgot what to do and where things were at work even though she had been doing these tasks for years. Tr. 43.  These problems are reasonably related to her slow processing speed and inability to maintain employment.  If anything, Stowell should be credited with trying to remain a productive member of the workforce despite her difficulties.  Accordingly, the ALJ erred by finding Stowell not credible based on her work history.

## IV.    **Past Relevant Work**

The ALJ found that Stowell was able to perform past relevant work as a telemarketer prior to July 1, 2009.  His decision, however, was based on an RFC that did not consider Dr. Eckstein's testimony regarding Stowell's mental functioning.  Thus, the RFC and the related past relevant work finding are invalid.  *See Robbins*, 466 F3d at 886 (finding ALJ's inadequate findings concerning a claimant's limitations caused his RFC to be "legally inadequate").

## V.    **Remand**

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court.  *Harman v. Apfel*, 211 F3d 1172, 1178 (9th Cir), *cert denied,* 531 US 1038 (2000).  The issue turns on the utility of further proceedings.  A

remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision. *Strauss v. Comm'r of the Social Sec. Admin.*, 635 F3d 1135, 1138-39 (9th Cir 2011), quoting *Benecke v. Barnhart*, 379 F3d 587, 593 (9th Cir 2004).  The court may not award benefits punitively, and must conduct a "credit-as-true" analysis to determine if a claimant is disabled under the Act.  *Id* at 1138.

Under the "crediting as true" doctrine, evidence should be credited and an immediate award of benefits directed where "(1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited."  *Id.*  The "crediting as true" doctrine is not a mandatory rule in the Ninth Circuit, but gives the court flexibility in determining whether to enter an award of benefits upon reversing the Commissioner's decision. *Connett v. Barnhart*, 340 F3d 871, 876 (9th Cir 2003), citing *Bunnell*, 947 F2d at 348.  The reviewing court declines to credit testimony when "outstanding issues" remain. *Luna v. Astrue*, 623 F3d 1032, 1035 (9th Cir 2010).

The ALJ's decision, as later affirmed by the Appeals Council, is not based on substantial evidence because it did not consider the new evidence from Dr. Eckstein or accurately assess Stowell's credibility.  Crediting the omitted evidence establishes that Stowell had a slow processing speed in 2007 when she first applied for disability.  Therefore, the RFC assessment and hypothetical questions to the VE at step five in the sequential disability analysis are not based upon the proper legal standards.

Under these circumstances, awarding benefits is appropriate.  The record reveals that Stowell suffered the same severe physical and mental impairments in 2007, including her slow processing, that supported a finding of disability beginning July 1, 2009.   Those impairments resulted in her removal from the regular work schedule as a telemarketer by May 2007 and her later termination on December 18, 2007.  Thus, on May 31, 2007, when she alleged the onset of her disability, Stowell could not perform sedentary work any better than she could on July 1, 2009.  Since no outstanding issues remain to be resolved, it is not necessary for the ALJ to further develop the record to ascertain Stowell's RFC.

## **ORDER**

For the reasons discussed above, the Commissioner's decision is REVERSED AND REMANDED pursuant to sentence four of 42 USC § 405(g) for an award of benefits.

DATED September 5, 2012.


s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge

22 – OPINION AND ORDER